**Application of Victor V. D'AN-CICCO et al.**
**Patent Appeal No. 8566.**

United States Court of Customs and Patent Appeals.
Jan. 6, 1972.

---

9. In In re Klug, 333 F.2d 905, 51 CCPA 1529 (1964), this court stated:

George T. Johannesen, Kalamazoo, Mich., attorney of record, for appellants; John Kekich, Kalamazoo, Mich., of counsel.

S. Wm. Cochran, Washington, D. C., for the Commissioner of Patents; Jack E. Armore, Washington, D. C., of counsel.

Before WORLEY, Chief Judge, and RICH, ALMOND, BALDWIN, and LANE, Judges.

BALDWIN, Judge.

This appeal is from the decision of the Patent Office Board of Appeals which sustained the rejection of claims 9 and 10 of appellants' application [1] as unpatentable under 35 U.S.C. § 103.

*The Invention*

The claims on appeal are directed to rigid polyurethane foams made by reacting particular mixtures of polyisocyanates with a polyol which has a high hydroxy number. The polyol may be either a polyester or a polyether polyol. Claim 10 is representative of the claims on appeal and reads as follows (paragraphing ours):

A strong, rigid polyurethane foam characterized by great mechanical strength at elevated temperatures which is the product of the reaction under foam-forming conditions of

a polyisocyanate containing 37 to 40 percent diisocyanate and

a polyester of a polycarboxylic acid and a polyhydric alcohol, and

said polyisocyanate being polymethylene polyphenyl isocyanate obtained by phosgenation of the mixture of primary amines formed by condensing aniline and formaldehyde in the presence of a mineral acid and

said polyester having a hydroxyl number which is in the range of 440 to 495 and an acid number which is in the range of 1.5 to 45.

Claim 9 is analogous to claim 10, but recites a polyether polyol having a hydroxy number in the range of 374 to 495 instead of the polyester reactant of claim 10.[2]

In their brief, appellants state:

The crux of appellants' invention lies in the selection of a particular polyisocyanate and reacting it with a polyol of sufficiently high hydroxyl number to form a rigid foam. By virtue of this selection appellants obtained a product having high mechanical strength at elevated temperatures.

*The Prior Art*

The prior art relied on by the examiner and the board consisted of patents to Seeger et al.,[3] Reis,[4] Rogers et al.,[5] Bend-

1. Application No. 520,059, filed January 12, 1966, which is a continuation in part of application No. 257,745, filed February 11, 1963, which in turn is a continuation in part of application No. 679,771, filed August 22, 1957.

2. Claim 9, as it is presented in the record, also recites that the polyether polyol is "of the kind known in the art to react with polyisocyanates to form rigid polyurethane foams." This language formed the basis for a rejection of claim 9 by the examiner under 35 USC 112. The solicitor's brief states that a proposed amendment was filed after the examiner's answer which would delete the offending language. The board treated the claim as so amended. We shall do likewise.

3. U.S. Patent 2,683,730, issued July 13, 1954.

4. U.S. Patent 2,779,689, issued January 29, 1957.

5. U.S. Patent 2,827,665, issued March 25, 1958, on an application filed October 26, 1954.

er et al.,[6] and Bender,[7] as well as certain admissions in appellants' specification regarding the state of the prior art.

The Seeger et al. patent is directed to mixtures of polyisocyanates which contain a controlled maximum amount of diisocyanate, and methods for preparing those mixtures. Appellants concede that the Seeger et al. patent fully discloses the polyisocyanates recited in the claims on appeal. Seeger et al. state that their mixtures "may be used to advantage in polymeric reactions with compounds containing reactive hydrogens." They further state that the mixtures can be used in cross-linking certain diisocyanate-modified polyesters and polyesteramides.

Reis is directed to solid polyurethane foams and their preparation, particularly those made by the reaction of a diisocyanate and a polyester made from a dicarboxylic acid and alcohols containing two or more hydroxyl groups per molecule. Reis is primarily relied on for his disclosure that the use of polyesters of high hydroxyl number results in rigid, as opposed to flexible, foams.

The Rogers et al., Bender et al. and Bender patents deal with the preparation of flexible foams. All disclose the use of polyesters having low hydroxyl numbers (20–110). All list the polyisocyanate mixtures of Seeger et al., along with other polyisocyanates, as reactants which may be employed to cross link active hydrogen containing compounds such as polyesters and hydroxyl-containing polyethers in making the foams. Since the pertinent disclosures of these three references are almost identical, we shall not further consider the Bender et al. and Bender patents.

The parts of applicants' specification relied on as admissions by the examiner amount to statements that the prior art was aware that polyols having high hydroxyl numbers should be used in order to produce rigid foams. These statements are at best cumulative to the Reis patent, which is more specific in indicating the range of hydroxyl numbers which will give rigid foams. Therefore we shall not further deal with the admissions in appellants' specification.

### The Rejection

The examiner pointed out that Rogers et al. disclosed the use of the Seeger et al. mixtures of polyisocyanates to cross link the polyesters or polyether polyols to form polyurethane foams. He considered that since the art, as exemplified by Reis, was aware of the use of polyols of high hydroxyl number to form rigid foams, it would have been obvious in the sense of 35 U.S.C. § 103 to react the high hydroxy number polyols with the polyisocyanates of Seeger et al., to form rigid foams. The board considered the rejection sustainable from either of two viewpoints:

> The rejection in question is sustainable whether treated from the standpoint of substituting polyether polyols or polyesters of high hydroxyl number in the foams of Rogers et al., Bender et al. ('409), or Bender ('412), thereby producing rigid foams rather than flexible foams, as suggested by the teachings of Reis, or from the standpoint of substituting the polyisocyanate of Seeger et al., Rogers et al., Bender et al. ('409), or Bender ('412) for the polyisocyanate of Reis, thereby meeting the terms of the appealed claims.

The board also considered several affidavits of record, but found them not to be pertinent to the subject matter of the appealed claims. Appellants state in their brief that they do not rely on those affidavits before this court.

### Opinion

We agree with the reasoning of the examiner and of the first ground of affirmance given by the board. We therefore find it unnecessary to consider the board's alternative ground of affirmance.

6. U.S. Patent 2,888,409, issued May 26, 1959, on an application filed March 21, 1955.

7. U.S. Patent 2,888,412, issued May 26, 1959, on an application filed December 21, 1955.

Appellants complain that the Patent Office has concluded that the invention was obvious "without showing that it is explicitly taught in the art." If the invention had been explicitly taught by the prior art the proper basis for rejection would have been section 102 of the statute, rather than section 103. It is uncontroverted that the art was well aware of the type of polyols used to obtain rigid foams. Rogers et al. shows that the Seeger et al. polyisocyanates are useful cross-linking agents for the formation of polyurethane foams from polyols. The Seeger et al. patent itself suggests the cross-linking abilities of their polyisocyanate mixture. Thus the Patent Office has established a prima facie case that it would have been obvious to the man of ordinary skill in the art, with these references before him, to use polyols having a high hydroxyl number in conjunction with the Seeger et al. polyisocyanates should a rigid foam be desired.

Appellants contend that the teachings of Reis are restricted to the use of *di*-isocyanates. However, Rogers et al. fairly discloses that diisocyanates, triisocyanates, tetraisocyanates and the mixture of polyisocyanates of Seeger et al. can be used as cross-linking agents in the type of reactions here involved. Reis does not teach against the use of polyisocyanates having a functionality greater than two, he merely discloses only diisocyanates. One of the diisocyanates *dis*-closed as useful by Reis is p'-diisocyanate diphenylmethane, which is the diisocyanate of the Seeger et al. mixture. We therefore find appellants' argument unpersuasive.

Appellants also contend that the particular combinations claimed result in rigid foams having high mechanical strength at elevated temperatures, which result they characterize as "unexpected." They direct our attention to their specification, which contains the following statements concerning what was presumably the state of the art at the time the invention was made:

While the use of these modified polyfunctional isocyanates does improve the heat resistance, presumably by increasing the degree of cross-linking, our experiments coupled with statements in the published technical literature indicate, however, that this approach is successful in increasing the maximum service temperature only to about 250 to 300°F., depending on density, dimensional stability needs and load-bearing requirements. For instance, both Modern Plastics Encyclopedia, p. 520 (1956), and Technical Data on Plastics, p. 195 (Manufacturing Chemists Association, 1957) list 250 to 300°F. as the maximum operating temperatures for rigid polyurethane foams.

Additionally, example 4 of appellants' specification contains measurements of the compressive strength of several samples of foams covered by the appealed claims. The measurements were made at temperatures of up to 600°F. Following these measurements the specification states that "[s]ample foams maintained at 400° for several days showed no signs of deterioration."

These statements in appellants' specification are patently inadequate to establish even a difference between appellants' foams and those known to the prior art, much less that any such difference would have been unexpected. The above-quoted paragraph, dealing with unspecified experiments "coupled with statements in the published technical literature," does not establish what the level of skill in the art was at the time the invention was made. The cited references are not in the record, so we are left with appellants' evaluation of them. Appellants state that these references report the "maximum operating temperatures for rigid polyurethane foams." However, there is no reason for us to assume that they report the values for those rigid foams which the art considered had high mechanical strength at elevated temperatures. Further, nothing is presented to show what considerations went into the determina-

tion of the "maximum service temperature" or the "maximum operating temperature" of rigid foams. It may well be that the operability of foams was limited as a practical matter because they failed after only a few weeks or months of continuous service at higher temperatures. Yet the most favorable information provided regarding appellants' foams is that "[s]ample foams maintained at 400° for *several days* showed no signs of deterioration" (emphasis supplied). This statement does not establish a *service* or *operating* temperature for appellants' foams even for a period of several days,

for it is not stated whether the foams were maintained in load-bearing use during this period or how the foams were tested for deterioration. With regard to the measurements of compressive strength presented in example 4, we note that no comparison is made with prior art foams under the same conditions. Thus, as far as the record shows, the prior art foams may have had high temperature properties which were comparable to appellants' foams.

The decision of the Board of Appeals is affirmed.

Affirmed.